# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

KARON DOLLAR,

*Plaintiff,*

-against-

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF CORRECTION
COMMISSIONER DORA SCHRIRO; NEW
YORK CITY DEPARTMENT OF CORRECTION
DEPUTY COMMISSIONER OF INTEGRITY
AND POLICY FLORENCE FINKLE; NEW
YORK CITY DEPARTMENT OF CORRECTION
CHIEF EVELYN A. MIRABAL; NEW YORK
CITY DEPARTMENT OF CORRECTION
DEPUTY CHIEF GREGORY MCLAUGHLIN;
OTIS BANTUM CORRECTIONAL CENTER
WARDEN OF SECURITY STEPHEN
WETTENSTEIN; OTIS BANTUM
CORRECTIONAL CENTER SUPERVISING
DEPUTY WARDEN OF SECURITY
JACQUELINE BRANTLEY; JOHN DOE; JANE
DOE 1; JANE DOE 2; and JANE DOE 3.

*Defendants.*

**14 CV    8893**

## COMPLAINT AND JURY DEMAND

Case No.



JUDGE SCHOFIELD

## PRELIMINARY STATEMENT

1.      This is a civil rights action brought by Plaintiff Karon Dollar for damages
pursuant to 42 U.S.C. § 1983.

2.      On or about May 11, 2013, Defendants John Doe and Jane Doe 1, Jane
Doe 2, and Jane Doe 3, and between six and twelve unknown New York City Department of
Correction ("Department" or "DOC") officers, while employed by the City of New York (the

"City"), DOC, at the Otis Bantum Correctional Center ("OBCC") at Rikers Island, brutally beat, without provocation, Plaintiff Karon Dollar, a then-inmate at the OBCC.

3.      The correction officers and captains, without provocation, viciously attacked and struck Mr. Dollar in his face, head, and body.  The attack caused severe facial trauma to Mr. Dollar, requiring oral surgery and stitches.  The DOC and its supervisors are, and have been, aware that DOC staff members persistently use excessive force and cause prisoners serious injuries, and they have consistently failed to take meaningful and effective steps to curb the staff brutality in the jails.  The incident involving Mr. Dollar is part of a pattern of incidents where Department officers and captains use excessive and injurious force to command, control, and discipline inmates.

4.      Mr. Dollar brings this action to recover for harm suffered from Defendants' violation of his rights under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment.

## JURISDICTION AND VENUE

5.      This action arises under: (i) the Eighth and Fourteenth Amendments to the United States Constitution and (ii) 42 U.S.C. §§ 1983 and 1988.

6.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1332, and 1343(a)(3)-(4).

7.      Venue is proper in the Southern District of New York under 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

8.      This action has been commenced within less than three (3) years after the happening of the events upon which the claim is based.

2

9.    A Notice of Claim was filed within ninety (90) days of the incident.

## THE PARTIES

10.    Plaintiff Karon Dollar is a citizen of the United States and a resident of Pennsylvania.  At the time the correction officers attacked him, on or about May 11, 2013, Mr. Dollar was incarcerated at the OBCC at Rikers Island in Bronx County.  Mr. Dollar was transferred to Downstate Correctional Facility ("Downstate") in Fishkill, New York on or about July 23, 2013, and then Northampton County Department of Corrections ("Northampton") in Easton, Pennsylvania on or about August 23, 2013.  Mr. Dollar was released from Northampton on August 29, 2013.

11.    Defendant City of New York is a municipal corporation that, through the DOC, operates a number of detention facilities including the OBCC at Rikers Island.  The DOC, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting, and investigation of force by uniformed staff.  In addition, senior officials in the DOC are aware of and tolerate practices by subordinate employees in the jails, including those that are inconsistent with formal policy.  These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten DOC policies or customs.  The DOC is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the Defendants referenced herein.

*The Supervisor Defendants*

12.    At all times relevant hereto, Defendant Dora Schriro was the Commissioner of the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such, and acting under color of state law.  On

3

information and belief, Defendant Schriro, as Commissioner of the DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the Defendants referenced herein.  As Commissioner, Defendant Schriro is also responsible for the care, custody, and control of all inmates housed in the Department's jails.  As Commissioner, Defendant Schriro is responsible for ensuring that DOC personnel obey the laws of the United States and of the State of New York.  Defendant Schriro is sued in her individual capacity.

13.    At all times relevant hereto, Defendant Florence Finkle was the Deputy Commissioner of Integrity and Policy of the DOC.  As Deputy Commissioner, Defendant Finkle was responsible for ordering and supervising the investigation of any and all incidents in which any employee of the Department used force against any inmate.  Defendant Finkle was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other violent incidents in Department jails.  She was responsible for initiating recommendations for disciplinary action against officers and captains who engaged in misconduct.  At all times referred to in this Complaint, Defendant Finkle was acting within the scope of her employment as an employee of the Department and acting under color of state law.  Defendant Finkle is sued in her individual capacity.

14.    At all relevant times hereto, Defendant Evelyn A. Mirabal was the Chief of the Department, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such, and acting under color of state law.  As Chief of Department, she was the highest ranking uniformed member of the Department, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in all the Department jails.  She was also responsible for the care, custody, and control of all inmates in the

Department jails.  As Chief of Department, Defendant Mirabal is provided, on a daily basis, with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails.  Defendant Mirabal is sued in her individual capacity.

15.     At all relevant times hereto, Defendant Gregory McLaughlin was the Deputy Chief of the Department.  As Deputy Chief, his responsibilities included supervising the investigation of any and all incidents in which any employee of the Department used force, or is alleged to have used force, against any inmate, and recommending Department discipline against staff believed to have violated Department policies and rules including those concerning the use of force.  Defendant McLaughlin was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails. Defendant McLaughlin is sued in his individual capacity.

16.     At all relevant times hereto, Defendant Stephen Wettenstein was the Warden of the OBCC at Rikers Island.  As Supervising Warden of the OBCC, Defendant Wettenstein was responsible for the supervision, oversight, and discipline of the uniformed security staff and for the care, custody, and control of all inmates at the OBCC.  At all relevant times, Defendant Wettenstein acted in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and under color of state law.  Defendant Wettenstein is sued in his individual capacity.

17.     At all relevant times hereto, Defendant Jacqueline Brantley was the Deputy Warden of Security of the OBCC at Rikers Island.  Upon information and belief, Defendant Brantley is responsible for the supervision, oversight, and discipline of the uniformed security staff and for the care, custody, and control of all inmates at the OBCC.  At all relevant times, Defendant Brantley acted in the capacity of agent, servant, and employee of Defendant

City, within the scope of her employment as such, and under color of state law.  Defendant

Brantley is sued in her individual capacity.

18.     Defendants Schriro, Finkle, Mirabal, McLaughlin, Wettenstein, and

Brantley, collectively, are the "Supervisor Defendants."

*The Correction Officer Defendants*

19.     At all times relevant hereto, John Doe, whose shield number the Plaintiff

has been unable to ascertain, a Correction Officer of the DOC, acted in the capacity of agent,

servant, and employee of the City, and within the scope of his employment as such.  John Doe

participated in the May 11, 2013 assault on Mr. Dollar.  Upon information and belief, John Doe

worked at the OBCC at the time of this incident.  Defendant John Doe is sued in his individual

capacity.

20.     At all times relevant hereto, Jane Doe 1, whose shield number the Plaintiff

has been unable to ascertain, a Captain of the DOC, acted in the capacity of agent, servant, and

employee of the City, and within the scope of her employment as such.  Jane Doe 1 participated

in the May 11, 2013 assault on Mr. Dollar.  Upon information and belief, Jane Doe 1 worked at

the OBCC at the time of this incident.  Defendant Jane Doe 1 is sued in her individual capacity.

21.     At all times relevant hereto, Jane Doe 2, whose shield number the Plaintiff

has been unable to ascertain, a Captain of the DOC, acted in the capacity of agent, servant, and

employee of the City, and within the scope of her employment as such.  Jane Doe 2 participated

in the May 11, 2013 assault on Mr. Dollar.  On information and belief, Jane Doe 2 worked at the

OBCC at the time of this incident.  Defendant Jane Doe 2 is sued in her individual capacity.

22.     At all times relevant hereto, Jane Doe 3, whose shield number the Plaintiff

has been unable to ascertain, a Captain of the DOC, acted in the capacity of agent, servant, and

employee of the City, and within the scope of her employment as such. Jane Doe 3 participated

in the May 11, 2013 assault on Mr. Dollar. On information and belief, Jane Doe 3 worked at the

OBCC at the time of this incident. Defendant Jane Doe 3 is sued in her individual capacity.

23.    Defendants John Doe, Jane Doe 1, Jane Doe 2, and Jane Doe 3,

collectively, are the "Correction Officer Defendants."

## BACKGROUND

### Correction Officer Defendants Launched an Unprovoked Attack on Mr. Dollar While He Was Handcuffed.

24.    On or about May 11, 2013, Mr. Dollar and other inmates at the OBCC

were on line waiting to enter the mess hall for lunch. Mr. Dollar observed another inmate,

Anthony Cooper, refuse to eat at the mess hall. Mr. Dollar witnessed Captain Jane Doe 1 take

Mr. Cooper from the mess hall, towards the intake hall. Mr. Dollar heard noise coming from the

area where Captain Jane Doe 1 took Mr. Cooper, peered out of line in the direction of the noise,

and saw Mr. Cooper being attacked. Mr. Dollar became concerned for Mr. Cooper, and walked

towards the intake area to check on Mr. Cooper.

25.    As Mr. Dollar walked down the main corridor towards Mr. Cooper,

Correction Officer John Doe tackled him to the floor without any warning or provocation. Once

tackled, Correction Officer John Doe pinned Mr. Dollar to the ground on his stomach, with his

right hand underneath his body and his left hand secured behind his back. Correction Officer

John Doe then commanded Mr. Dollar to stop resisting even though Mr. Dollar was not resisting,

and was incapable of doing so while Correction Officer John Doe had him secured and pinned to

the ground.

26.    While Mr. Dollar was pinned to the ground in the main corridor, only a

few feet away from Mr. Cooper, Correction Officer John Doe handcuffed him. Mr. Dollar

complained that the handcuffs were placed on his wrists too tightly, but the Correction Officer Defendants refused to loosen them.  Mr. Dollar continued to complain that the handcuffs were too tight.

27.     Mr. Dollar remained pinned to the ground for several minutes after Correction Officer John Doe had handcuffed him.  Captain Jane Doe 2 then approached the scene, and stated that Mr. Dollar had pushed her hand out of the way when he supposedly walked past her to see what had happened to Mr. Cooper.

28.     During this time, Mr. Dollar's head was pinned down so that his forehead touched the floor.  Out of the corner of his eye, he saw Captain Jane Doe 3 walk toward him and felt an officer step on the back of his head.  Captain Jane Doe 3 then kicked Mr. Dollar on the left side of his face, near his cheek.  Captain Jane Doe 2, Captain Jane Doe 3, and other unknown officers then beat Mr. Dollar while he remained cuffed and pinned to the ground by Correction Officer John Doe.  Mr. Dollar was punched and kicked in the nose by Captain Jane Doe 2.  Mr. Dollar remained handcuffed during the beating, and could not protect himself.

29.     The beating only stopped when Mr. Dollar's nose began to bleed and Correction Officer John Doe and another officer forced Mr. Dollar to stand by picking him up, off the ground, by his hair.  Mr. Dollar remained handcuffed throughout and after the unprovoked beating.

30.     During the attack, a probe team, which is a specialized group of correction officers who respond to incidents and provide reinforcement, responded to the incident with Mr. Cooper.

31.     After Mr. Dollar was pulled to his feet, certain probe team members approached Mr. Dollar and began punching him with their fists in his face and head, and kicking

him in the side of his stomach.  The probe team told Mr. Dollar that he "like[d] pushing people," and told him to stop resisting.  Because Mr. Dollar remained handcuffed, he was not resisting and could not raise his arms to protect himself.

32.    Mr. Dollar sustained a deep laceration above his left eye as a result of the probe team assault, which, in addition to his nose, began bleeding heavily.  The probe team then forced and pinned Mr. Dollar back down to the ground.  A short while later the probe team picked Mr. Dollar up off the ground and moved him to the intake room to wait for a Deputy Patterson.

33.    Upon information and belief, Randy Fields, another inmate at the OBCC, who had been waiting on line with Mr. Dollar in the mess hall corridor, witnessed the attack on Mr. Dollar by Captain Jane Doe 2, Captain Jane Doe 3, Correction Officer John Doe, the probe team, and other unknown officers.  Upon information and belief, Mr. Fields was also beaten for standing out of line and he filed a Notice of Claim and grievance with the jail as well.  Mr. Fields observed Mr. Dollar in the intake area after Mr. Dollar had been beaten.

34.    Mr. Cooper had remained in the intake area during the officers' assault on Mr. Dollar, and he observed Mr. Dollar in the intake area, badly beaten and bleeding.

35.    Mr. Dollar remained in the intake area for nearly one hour before Deputy Patterson entered the intake area.  After questioning Mr. Dollar, Deputy Patterson directed the probe team to take Mr. Dollar to the clinic.

**Mr. Dollar Sustained Serious Injuries as a Result of the Attack**

36.    Once at the clinic, Mr. Dollar insisted that jail officials take photographs of his injuries before his injuries were cleaned.  A female Captain took six pictures of Mr. Dollar at the clinic.  After his wounds were cleaned, Mr. Dollar was sent to the urgent care facility,

Urgicare, where he received additional treatment.  Mr. Dollar needed 13 stitches to close the laceration that the probe team inflicted above his left upper eye lid.  The doctor at Urgicare told Mr. Dollar that he had a fractured nose, but no x-rays were taken.  Mr. Dollar was given ibuprofen for his pain.

37.    When Mr. Dollar returned to his cell, he suffered a severe headache, and experienced pain in his shoulders and chest.  Mr. Dollar became concerned also about lumps that appeared on his head.

38.    Mr. Dollar returned to Urgicare the next day, on May 12, 2013, to have x-rays taken of his head.  At that time, he was experiencing a pounding headache, pain in his shoulders, and pain in the right side of his chest.  Mr. Dollar again received ibuprofen for the pain.

39.    As a result of the attack, Mr. Dollar also experienced other injuries.

40.    Approximately two weeks after the attack, Mr. Dollar began losing clear sight in his left eye.  As a result of the blows to his head and around his left eye, Mr. Dollar developed an astigmatism, or blurry vision, in his left eye that eventually required him to begin wearing glasses despite previously having had 20/20 vision for his entire life.

41.    Mr. Dollar required oral surgery on June 28, 2013, to repair a broken tooth that was damaged as a result of the beating.

42.    Mr. Dollar also suffers from ongoing nasal congestion as a result of the injuries to his nose.

**The Supervisor Defendants Refused to Investigate the Attack on Mr. Dollar.**

43.    On May 13, 2013, the Investigation Division of the DOC ("ID") interviewed Mr. Dollar about the attack.  The ID sent two female investigators who recorded the

10

interview, and took pictures of Mr. Dollar's fractured nose, the bruising and lumps on his head from the beating, and his swollen wrists from the too-tight handcuffs. Despite requesting a copy, Mr. Dollar never saw the ID report or the photographs.

44.    Based upon information and belief, the main corridor where the attack occurred was under video surveillance on or about May 11, 2013. Mr. Dollar requested a copy of the video evidence of the assault from the ID investigators, but he was never provided with them.

45.    Mr. Dollar was never contacted by the ID again.

46.    Mr. Dollar was charged with assaulting an officer during the May 11, 2013 beating, and given a ticket to attend a May 15, 2013 hearing before a Captain Carter.

47.    When served with the ticket to attend the hearing, Mr. Dollar requested that Mr. Cooper and Mr. Fields attend the hearing to present witness evidence on his behalf. At the time of the hearing, however, Captain Carter told Mr. Dollar that he never received a request from him to present witness evidence. Moreover, because Mr. Dollar's request to the ID investigators for the video footage of the main corridor in which the beating took place was never responded to, he was also unable to offer the tapes at his hearing.

48.    At the May 15 hearing, Captain Carter found Mr. Dollar guilty of assaulting an officer. Mr. Dollar received an infraction, and was sentenced to 135 days in the Bing, which is solitary confinement in a single cell at Rikers. Mr. Dollar served 77 days of this sentence before being transferred to Downstate, entering state custody.

49.    On June 26, 2013, Mr. Dollar filed a Notice of Claim regarding the attack. The number of the Notice of Claim is 213PIO1660.

### There is a Systematic and Widespread Pattern and Practice of Excessive Force by Correctional Officers at Rikers Island.

50.    For decades, through Department reports and civil litigation, the DOC has been aware of the routine and unconstitutional use of excessive force by staff at individual facilities—including those at the OBCC—in the large, multi-jail New York City DOC.

51.    The DOC has been sued by inmates in five class action lawsuits, as well as numerous individual lawsuits, over the past twenty-five years.  These lawsuits have exposed a pervasive culture of regular and institutionalized staff violence against inmates, a failure of accountability at every level, and deliberate indifference to (and tolerance of) these Constitutional violations.  *See Nunez v. City of New York, et al.*, 11-cv-5845 (LTS)(JCF), Second Am. Compl., ¶ 2 ("In five class actions and scores of individual lawsuits in twenty-five years, New York City Department of Correction . . . inmates have come before this Court alleging a pattern of brutality in New York City's jails.").

52.    The Department, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting, and investigation of force by uniformed staff, and access to medical and other program services mandated by local law and court orders.  Upon information and belief, senior officials in the Department are aware of and tolerate certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy.  These practices are widespread, long-standing, and deeply embedded in the culture of the agency.

53.    On August 4, 2014, the Department of Justice ("DOJ") issued a 79-page report on the mistreatment of adolescent inmates at Rikers.  The DOJ concluded that there was "a pattern and practice of conduct at Rikers that violates the constitutional rights of adolescent

inmates." Specifically, adolescent inmates were not "adequately protected from harm, including serious physical harm from the rampant use of unnecessary and excessive force by DOC staff," and there was "a deep-seated culture of violence" where the "DOC staff routinely utilize force not as a last result, but instead as a means to control the adolescent population and punish disorderly or disrespectful behavior." In its report, the DOJ wrote that its focus on the adolescent population was not "an exoneration of DOC practices in the jails housing adult inmates," because "while we did not specifically investigate the use of force against the adult inmate population, our investigation suggests that the systemic deficiencies identified in this report may exist in equal measure at the other jails on Rikers." U.S. Dep't of Justice, CRIPA Investigation of the New York City Dep't of Corr. Jails on Rikers Island (Aug. 4, 2014), *available at* http://www.justice.gov/usao/nys/pressreleases/August14/RikersReportPR/SDNY%20Rikers%20 Report.pdf ("DOJ Report").

    54.    On September 25, 2014, Administrative Law Judge Tynia D. Richard issued a report and recommendation regarding six correction officers at Rikers Island related to the use of force against an inmate, Robert Hinton. Judge Richard found that the force was "unnecessary, impermissible, and excessive, and that . . . [the correction officers] failed to report the true nature of the force used," and recommended that the DOC terminate the employment of the correction officers. *Dep't of Corr. v. Behari*, OATH Index Nos. 781-786/14, at *1-2 (September 25, 2014).

    55.    In July 2014, the *New York Times* reported the results of a four-month investigation into the violence perpetrated by correction officers against inmates at Rikers, and efforts by the DOC to cover up the violence. Correction officers used force on inmates more than 1,927 times in the first six months of 2014, which was a greater than 33 percent increase

over the same period in 2013. The use of force by correction officers has increased by nearly 90 percent within the last five years. Michael Winerip and Michael Schwirtz, *Rikers: Where Mental Illness Meets Brutality in Jail*, N.Y. TIMES, July 14, 2014, *available at* http://www.nytimes.com/2014/07/14/nyregion/rikers-study-finds-prisoners-injured-by-employees.html.

56.     The DOC is responsible also for the appointment, training, supervision, and conduct of all DOC personnel, including the Correction Officer Defendants referenced herein. In addition, at all relevant times, the City was responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obey the laws of the United States and of the State of New York.

57.     As the DOJ reported in August 2014, "[s]taff appear to be poorly versed in conflict resolution and de-escalation skills," frequently escalating a disagreement "into a physical confrontation." DOJ Report at 18. In addition, probe team members, which exist in each Rikers facility, "too often quickly resort to the use of significant levels of force." *Id.* at 19.

58.     Upon information and belief, through the DOC's reporting system, the Supervisor Defendants knew that DOC staff repeatedly used unnecessary and excessive force resulting in serious injuries to inmates.

59.     There has been long-standing evidence of systemic failures at the DOC to prevent the improper use of force against inmates. *See Fisher v. Koehler*, 692 F. Supp. 1519, 1564 (S.D.N.Y. 1988). DOC employees fail to adequately document use of force incidents, and often collude on the content of any report of use of force incidents. The DOJ found that "critical videotapes frequently go missing" for use of force incidents. DOJ Report at 28.

60.     Upon information and belief, the Supervisor Defendants were aware of the meaningful pattern of incidents involving the use of unnecessary and/or excessive force resulting in serious injuries to inmates, and failed to take sufficient steps to curb these abuses.

61.     Upon information and belief, Supervisor Defendants were also aware of the failures of the DOC's ID to adequately investigate allegations of misconduct and use of force incidents, a practice that allows further abuse to occur.

62.     The DOJ concluded that the DOC has systematically failed to conduct proper investigations of use of force incidents. *Id.* at 29-36.

63.     Correction officers often yell at an inmate to stop resisting in an attempt to establish a record that the use of force is necessary, even if the inmate was not resisting. *Id.* at 19-20.  The DOJ concluded that, "[t]his practice reflects a clear intent on the part of staff to cover up the use of unnecessary and excessive force." *Id.* at 20.

64.     The DOJ condemned the DOC's "top management" for fostering a "deeply entrenched organizational culture that accepts violence as an inherent part of a jail environment." *Id.* at 44.  Because the DOC's administrators and managers are often personally absent from the facilities, it "contributes to a broken organizational culture within the facilities that is largely defined by anti-inmate attitudes and a powerful code of silence." *Id.* at 45.

65.     Florence Finkle, the top investigator at the DOC, resigned in August 2014, after her department was criticized as ineffectual and biased towards correction officers. *See* Michael Winerip and Michael Schwirtz, *New York's Top Jail Investigator Resigns After Inquiry on Rikers Brutality*, N.Y. TIMES, Aug. 22, 2014, *available at* http://www.nytimes.com/2014/08/23/nyregion/investigations-chief-for-new-york-city-jails-steps-down-amid-rikers-brutality-reports.html.

66.     Based upon information and belief, the Department allows abuse to persist through inadequate investigations of improper use-of-force incidents and staff misconduct.  The Department also perpetuates abuse in its jails by failing to discipline officers in the face of obvious wrongdoing, and by failing to protect prisoners from violent guards.

67.     The Supervisor Defendants cannot credibly contend that they are unaware of the pattern of abuse that occurs with regularity in the City jails and the failure of the Department to take sufficient measures to investigate and discipline this abuse.

**COUNT I: FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983/Fourteenth**
**and Eighth Amendments**
(Against Correction Officer Defendants, Supervisor Defendants, and Defendant City of New York)

68.     Plaintiff repeats and realleges each of the foregoing paragraphs as if they were fully set forth at length herein.

69.     By reason of the foregoing, and by assaulting, battering, and using gratuitous and excessive force, the Correction Officer Defendants deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

70.     The Correction Officer Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employments as DOC captains and officers.  Said acts by the Correction Officer Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his

16

Constitutional rights secured by 42 U.S.C. § 1983, and by the Eighth and Fourteenth Amendments of the United States Constitution.

71.    The Supervisor Defendants knew and/or know that the pattern of physical abuse described above existed in the City jails and specifically at the OBCC prior to and including the time of the prison guards' assault on Mr. Dollar.

72.    In addition, the Supervisor Defendants failed to take reasonable steps to prevent the deprivation of Plaintiff's Constitutional rights secured by 42 U.S.C. § 1983 and by the Eighth and Fourteenth Amendments to the United States Constitution.

73.    The supervisory staff within the DOC know that the pattern and practice of physical abuse existed and still exists. The original failure of the Supervisor Defendants to take measures to curb a pattern of brutality at the OBCC constitutes acquiescence to the known unlawful behavior of their subordinates. The prevalence of these practices and general knowledge of their existence at the time of Plaintiff's beating, and the failure of these Defendants to take remedial action despite the fact that the misuse of force in City jails, and in circumstances such as these, had been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including the inmate named as Plaintiff in this action.

74.    The Supervisor Defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the Constitutional violations alleged in this complaint.

75.    Defendant City of New York is liable because it was aware and/or should have been aware of the pattern and practice of unnecessary and excessive force inflicted upon

17

inmates of New York City jails by the Correction Officer Defendants, and knowingly permitted and encouraged by the Supervisor Defendants.

76.     This pattern and practice of abuse is now so institutionalized as to constitute a policy or custom that has caused the deprivation of Plaintiff's Constitutional rights.

77.     The City has been and is on actual notice of these long-standing and institutionalized unlawful practices and policies, through among other things the prior lawsuits and the facts uncovered in discovery therein.

78.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Dollar sustained the damages hereinbefore alleged.

## COUNT II: SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983/Fourteenth
### and Eighth Amendments
(Against Supervisor Defendants and Defendant City of New York)

79.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

80.     DOC policies and procedures demonstrate deliberate indifference to the need to supervise correction officers to prevent an institutionalized pattern and practice of unnecessary and excessive force.

81.     The Supervisor Defendants have known, and for those Supervisor Defendants who are current DOC officials, do know the number, frequency, and severity of use of force incidents at Rikers, as well as the names of the staff involved.  They are aware that inmates continue to be at risk of unnecessary and excessive force at the hands of correction officers.

18

82.    The failure of the Supervisor Defendants to curb the pattern and practice of unnecessary and excessive force, despite their affirmative duty to do so, has fostered a culture in Rikers that tolerates such violence.  This constitutes deliberate indifference on the part of the Supervisor Defendants to the rights and safety of the inmates in their custody and care.  The actions of the Supervisor Defendants is a substantial factor in the continuation of these practices.

83.    The Supervisor Defendants retain correction officers and captains with demonstrated histories of misconduct, who use unnecessary and excessive force against inmates, and refuse to transfer them to non-contact positions.

84.    Defendant Finkle, and the department she oversaw, systematically failed to conduct meaningful investigations into the use of force by DOC staff.  The ID routinely fails to conduct investigations as required by the DOC, improperly credits implausible correction officer accounts that are inconsistent with inmates' injuries or collaboratively manufactured after the fact.  The ID routinely fails to credit inmate accounts, even when supported by eyewitness accounts and is consistent with inmate injuries.  The ID also regularly fails to take, review, and preserve crucial evidence, including videotape, medical records, and physical evidence.  The ID's failure to act is a significant contributing factor to the pattern and practice of unnecessarily and excessive force in Rikers.

85.    Defendant City of New York, through the DOC, and acting under the pretense and color of law, has permitted, tolerated, and been deliberately indifferent to a pattern and practice of staff brutality at the OBCC.  This widespread tolerance of correction officer abuse of prisoners constitutes a municipal policy, practice, or custom and led to the assault of the Plaintiff.

86.     By permitting, tolerating, and sanctioning these persistent and widespread policies, practices, and customs, pursuant to which Plaintiff was subjected to a brutal beating, Defendant City of New York has deprived Plaintiffs of the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed under the Eighth and Fourteenth Amendments to be free from gratuitous and excessive force and retaliation.

87.     As a direct and proximate result of the policy, practice, and custom detailed above, Plaintiff sustained the damages hereinbefore alleged.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:**

88.     an order awarding compensatory and other damages to Karon Dollar in an amount to be determined at trial;

89.     an order awarding punitive damages against the Defendants in an amount to be determined at trial;

90.     reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and 42 U.S.C. § 1997e(d);

91.     an order directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs and disbursements of this action.

## JURY DEMAND

92.     Plaintiff demands trial by jury in this action.

20

Dated: November 7, 2014                    Respectfully submitted,
       New York, New York


By: _____
      Ross Galin
      rgalin@omm.com
      Courtney Wen
      cwen@omm.com
      Shara Venezia-Walerstein
      svenezia-walerstein@omm.com
      Vincent Weisband
      vweisband@omm.com
      O'MELVENY & MYERS LLP
      7 Times Square
      Times Square Tower
      New York, N.Y. 10036
      Tel: (212) 326-2000
      Fax: (212) 326-2061

      *Attorneys for Plaintiff Karon Dollar*